**No. 19-35461**
**(Consolidated with Nos. 19-35460 and 19-35462)**

Oral Argument to be Scheduled

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

LEAGUE OF CONSERVATION VOTERS, *et al.*,
*Plaintiffs-Appellees*,

v.

DONALD J. TRUMP, in his official capacity as
President of the United States, *et al.*,
*Defendants*,

STATE OF ALASKA,
*Intervenor-Defendant*,

and

AMERICAN PETROLEUM INSTITUTE,
*Intervenor-Defendant-Appellant*.

On Appeal From the United States District Court For the District of Alaska
No. 3:17-cv-00101 (Hon. Sharon L. Gleason)

**AMERICAN PETROLEUM INSTITUTE'S OPENING BRIEF**

Steven J. Rosenbaum
Bradley K. Ervin
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, N.W.
Washington, D.C. 20001
(202) 662-6000
srosenbaum@cov.com

*Attorneys for American Petroleum*
*Institute*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1 the American Petroleum Institute discloses that it is a not for profit corporation, and that no publicly owned company owns any stock in the American Petroleum Institute.

/s/  *Steven J. Rosenbaum*
Steven J. Rosenbaum
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, N.W.
Washington, D.C. 20001
Phone: (202) 662-6000
Fax: (202) 662-6291
srosenbaum@cov.com

*Attorney for American Petroleum Institute*

Dated:  November 22, 2019

i

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ....................................... i

TABLE OF CONTENTS........................................................................ ii

TABLE OF AUTHORITIES ............................................................... iv

INTRODUCTION ................................................................................ 1

JURISDICTION.................................................................................... 3

ISSUES PRESENTED.......................................................................... 3

PERTINENT STATUTES AND REGULATIONS ................................ 4

STATEMENT OF THE CASE.............................................................. 4

    A.    OCSLA Mandates Expeditious Exploration And Development
        Of The Nation's Critical OCS Oil And Gas Resources. ...................... 4

    B.    Congress Designed A Four-Stage Government Review Process
        To Expedite Orderly OCS Exploration And Development. ............... 6

        1.    The Five-Year Leasing Program............................................. 6

        2.    The Lease Sale. ...................................................................... 8

        3.    The Exploration Stage............................................................. 9

        4.    Development And Production.................................................. 9

    C.    Presidential Withdrawals Of OCS Lands From Consideration
        For Leasing. ......................................................................... 10

    D.    Plaintiffs' Lawsuit. ........................................................... 15

SUMMARY OF ARGUMENT ........................................................... 17

STANDARD OF REVIEW ................................................................. 19

ARGUMENT ...................................................................................... 20

I.    SECTION 1341(a) AUTHORIZES PRESIDENTIAL
    MODIFICATION OF OCS WITHDRAWAL DECISIONS....................... 20

A. Section 1341(a)'s Broad Discretionary Language Authorizes The President Both To Withdraw And Modify A Withdrawal Of OCS Lands From Consideration For Leasing.............................. 20

B. OCSLA's Developmental Purpose Supports Reading Section 1341(a) To Authorize The President Both To Withdraw And Modify A Withdrawal Of OCS Lands From Consideration For Leasing. ............................................................................. 27

C. Presidential And Congressional Practice Supports Reading Section 1341(a) To Authorize The President Both To Withdraw And Modify A Withdrawal. ............................................. 30

II. THE PRESIDENT'S DELEGATED DISCRETIONARY AUTHORITY UNDER SECTION 1341(a) COMBINED WITH THE PRESIDENT'S ARTICLE II POWERS FURTHER SUPPORT EXECUTIVE ORDER 13795. .................................................... 37

CONCLUSION ................................................................. 39

CERTIFICATE OF COMPLIANCE ....................................... 41

STATEMENT OF RELATED CASES ................................... 42

iii

# TABLE OF AUTHORITIES

**Page(s)**

## <u>Cases</u>

*Abramski v. United States*,
573 U.S. 169 (2014) ............................................................... 3, 20, 27

*Alliance for the Wild Rockies v. Bradford*,
856 F.3d 1238 (9th Cir. 2017) ............................................................19

*Am. Coal Co. v. Fed. Mine Safety & Health Review Comm'n*,
796 F.3d 18 (D.C. Cir. 2015) .............................................................27

*Ayala-Caballero v. Coleman*,
58 F. App'x 669 (9th Cir. 2002) ........................................................21

*California v. Watt*,
668 F.2d 1290 (D.C. Cir. 1981) ......................................................5, 29

*Campbell v. City of Los Angeles*,
903 F.3d 1090 (9th Cir. 2018) ...........................................................20

*Chan Healthcare Grp., PS v. Liberty Mut. Fire Ins. Co.*,
844 F.3d 1133 (9th Cir. 2017) ...................................... 2, 20, 27, 31, 37

*Ctr. for Biological Diversity v. Salazar*,
706 F.3d 1085 (9th Cir. 2013) ...........................................................19

*Ctr. for Biological Diversity v. U.S. Dep't of the Interior*,
563 F.3d 466 (D.C. Cir. 2009) ..................................................... 4, 6, 9

*Ctr. for Sustainable Econ. v. Jewell*,
779 F.3d 588 (D.C. Cir. 2015) .............................................................7

*Dames & Moore v. Regan*,
453 U.S. 654 (1981) .......................................................... 17, 38, 39

*Donovan v. S. Cal. Gas Co.*,
715 F.2d 1405 (9th Cir. 1983) ...........................................................30

*EEOC v. Peabody W. Coal Co.*,
773 F.3d 977 (9th Cir. 2014) .............................................................33

*Erdelyi v. O'Brien*,
680 F.2d 61 (9th Cir. 1982) ...............................................................20

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*,
561 U.S. 477 (2010) .........................................................................24

iv

*Goldwater v. Carter*,
  444 U.S. 996 (1979) ...................................................................25

*Haig v. Agee*,
  453 U.S. 280 (1981) .............................................................. 30, 31

*In re DBSI, Inc.*,
  869 F.3d 1004 (9th Cir. 2017) ....................................................27

*K Mart Corp. v. Cartier, Inc.*,
  486 U.S. 281 (1988) ...................................................................27

*Lockerty v. Phillips*,
  319 U.S. 182 (1943) ...................................................................22

*Marbury v. Madison*,
  5 U.S. 137, 1 Cranch 137 (1803).................................................33

*McCulloch v. Maryland*,
  17 U.S. 316, 4 Wheat. 316 (1819)...............................................33

*Moran v. Screening Pros, LLC*,
  923 F.3d 1208 (9th Cir. 2019)....................................................19

*Myers v. United States*,
  272 U.S. 52 (1926) .....................................................................23

*N. Border Pipeline Co. v. Jackson Cty.*,
  512 F. Supp. 1261 (D. Minn. 1981) ............................................22

*N. Slope Borough v. Andrus*,
  642 F.2d 589 (D.C. Cir. 1980)......................................................8

*New Process Steel, L.P. v. NLRB*,
  560 U.S. 674 (2010) ...................................................................31

*NLRB v. Noel Canning*,
  573 U.S. 513 (2014) ...................................................................33

*Parra v. Astrue*,
  481 F.3d 742 (9th Cir. 2007) ................................................ 18, 30

*Pennsylvania v. Lynn*,
  501 F.2d 848 (D.C. Cir. 1974).............................................. 25, 26

*Presidio Historical Ass'n v. Presidio Trust*,
  811 F.3d 1154 (9th Cir. 2016) .............................................. 27, 30

*Quinn v. California Shipbuilding Corp.*,
  76 F. Supp. 742 (S.D. Cal. 1947) ...............................................21

v

*S. Utah Wilderness All. v. BLM,*
    425 F.3d 735 (10th Cir. 2005) ...............................................................37

*Saxbe v. Bustos,*
    419 U.S. 65 (1974) ..............................................................................31

*Sec'y of the Interior v. California,*
    464 U.S. 312 (1984) ..............................................................................6

*Shurtleff v. United States,*
    189 U.S. 311 (1903) ............................................................................26

*Udall v. Tallman,*
    380 U.S. 1 (1965) ................................................................................33

*United States v. Amirnazmi,*
    645 F.3d 564 (3rd Cir. 2011) ...............................................................31

*United States v. Midwest Oil Co.,*
    236 U.S. 459 (1915) ........................................... 3, 18, 31, 32, 33, 34

*Yates v. United States,*
    135 S. Ct. 1074 (2015) .........................................................................28

*Youngstown Sheet & Tube Co. v. Sawyer,*
    343 U.S. 579 (1952) ................................................... 17, 19, 37, 38, 39

*Zivotofsky ex rel. Zivotofsky v. Sec'y of State,*
    725 F.3d 197 (D.C. Cir. 2013) .............................................................38

## **Statutes**

21 U.S.C. § 154 ......................................................................................21

28 U.S.C. § 1291 ......................................................................................3

28 U.S.C. § 1331 ......................................................................................3

28 U.S.C. § 2071(a) ................................................................................21

43 U.S.C. § 1331(a) ..................................................................................4

43 U.S.C. § 1331(b) ..................................................................................6

43 U.S.C. § 1332(3) ..............................................................................5, 28

43 U.S.C. § 1337(a)(1) .............................................................................8

43 U.S.C. § 1340(c) ..................................................................................9

43 U.S.C. § 1341(a) ..................................................................... 1, 10, 17

43 U.S.C. § 1344(a) ...............................................................................6, 7

43 U.S.C. § 1344(d)(3)...........................................................................7

43 U.S.C. § 1349.................................................................................16

43 U.S.C. § 1351..................................................................................9

43 U.S.C. § 1802(1) ................................................................. 1, 5, 24, 28

43 U.S.C. §§ 1331, *et seq*....................................................................1, 5

Pub. L. No. 105-83, 111 Stat. 1543 (Nov. 14, 1997).................................12

Pub. L. No. 109-54, 119 Stat. 499 (Aug. 2, 2005)....................................12

## Other Authorities

H.R. Rep. No. 83-413 (1953), *reprinted in* 1953 U.S.C.C.A.N 2177 ................1, 28

H.R. Rep. No. 95-590 (1977), *reprinted in* 1978 U.S.C.C.A.N 1450 ......................5

VanDercreek, *From the Judiciary Act of 1789 to the Judicial Improvements Act of 1989 - Two Hundred Years of Non-Inferior Inferior Courts*,
14 Okla. City U. L. Rev. 565 (1989) ....................................................23

## Regulations

30 C.F.R. § 250.410 ...............................................................................9

30 C.F.R. § 550.202(e) ...........................................................................8

30 C.F.R. § 550.208(a) ...........................................................................8

30 C.F.R. § 550.209 ...............................................................................8

30 C.F.R. § 551.2 ..................................................................................8

30 C.F.R. § 551.5 ..................................................................................8

30 C.F.R. § 551.6 ..................................................................................8

## Constitutional Provisions

U.S. Const. art. I § 1.............................................................................34

U.S. Const. art. II § 2 ................................................................. 23, 24, 25

U.S. Const. art. II § 3 ............................................................................28

U.S. Const. art. III § 1 .................................................................. 2, 21, 23

U.S. Const. art. IV § 3...........................................................................34

# INTRODUCTION

This lawsuit challenges the April 28, 2017 Executive Order 13795, "Implementing an America-First Offshore Energy Strategy." Section 5 of the Executive Order modified previous orders issued by President Obama withdrawing certain areas of the Outer Continental Shelf ("OCS") in the Arctic and Atlantic Oceans from potential disposition for oil and gas leasing pursuant to the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. §§ 1331, *et seq*. Section 5 modifies those orders to re-open certain sections of the Arctic and Atlantic OCS for potential future disposition for oil and gas leasing.

"The principal purpose of [OCSLA] is to authorize the leasing by the Federal Government of . . . the [OCS],"[1] and encourage the "expedited exploration and development of the [oil and gas resources of the OCS] in order to achieve national economic and energy policy goals, assure national security, reduce dependence on foreign sources, and maintain a favorable balance of payments in world trade," 43 U.S.C. § 1802(1). Plaintiffs and the district court nevertheless read OCSLA's delegation to the President of discretionary ("may") authority "from time to time" to "withdraw from disposition any of the unleased lands of the [OCS]," 43 U.S.C. § 1341(a) ("Section 1341(a)"), to permit a President to contravene Congress' overriding developmental purpose by withdrawing unleased

---

[1] H.R. Rep. No. 83-413, at 2 (1953), *reprinted in* 1953 U.S.C.C.A.N 2177, 2178.

1

OCS lands entirely and indefinitely from leasing, development, and the reach of either a future elected President or Congress itself (absent enactment of a repealing statute subject to the President's veto).

OCSLA does no such thing.[2]  Rather, Section 1341(a) confers upon the President broad discretion over withdrawals in language—delegating authority that the President "may" exercise "from time to time"—long-understood likewise to confer authority to modify previous exercises of that discretionary authority.  For example, the Constitution uses that discretionary ("may") formulation only once—authorizing Congress to establish lower federal courts "from time to time."  U.S. Const. art. III § 1.  That provision has been understood and applied to confer great flexibility upon Congress to modify the jurisdiction of lower federal courts, and to create and abolish lower federal courts, as Congress sees fit to meet existing circumstances.

Moreover, the breadth of Section 1341(a)'s delegation language is confirmed when viewed, as it must be, in light of OCSLA's "structure, history, and purpose," *Chan Healthcare Grp., PS v. Liberty Mut. Fire Ins. Co.*, 844 F.3d 1133, 1138 (9th Cir. 2017) (quoting *Abramski v. United States*, 573 U.S. 169, 179

---

[2] Intervenor-Defendant American Petroleum Institute ("API") incorporates by reference the Federal Defendants' arguments demonstrating both that Plaintiffs' claims are not justiciable, and that they fail on the merits.  API focuses this reply on further grounds and authorities for rejecting Plaintiffs' claims.

(2014)), and further bolstered by past congressional and presidential implementation of Section 1341(a), *see United States v. Midwest Oil Co.*, 236 U.S. 459, 472–73 (1915), and the President's independent constitutional powers.

Plaintiffs' contrary interpretation of Section 1341(a)'s delegation of authority to the President cannot square with these determinants of statutory meaning, and the district court's resulting judgment vacating Section 5 of Executive Order 13795 cannot stand.

## JURISDICTION

Plaintiffs initiated this action by filing a complaint alleging claims under the Constitution and OCSLA. The district court exercised subject-matter jurisdiction pursuant to 28 U.S.C. § 1331.

On March 19, 2018, the district court denied the Federal Defendants' and API's motions to dismiss the complaint. On March 30, 2019, the district court granted the Plaintiffs' cross-motion for summary judgment. The district court entered judgment on April 1, 2019. On May 28, 2019, API filed a timely notice of appeal. *See* API Supplemental Excerpts of Record ("API Supp. E.R.") 1–6.

This Court's jurisdiction rests upon 28 U.S.C. § 1291.

## ISSUES PRESENTED

1. Whether Section 1341(a) authorizes a President only permanently to withdraw unleased OCS lands from disposition for leasing where Congress used

3

broad, discretionary language traditionally interpreted to convey an incidental power to modify prior exercises of discretion, OCSLA's principal purpose is to encourage and expedite—not halt—development of the Nation's oil and gas resources on the OCS, and past presidential exercise of authority under Section 1341(a) has consistently included time-limited and modified withdrawals contrary to Plaintiffs' claim that Section 1341(a) withdrawals are inviolate.

2.   Whether Plaintiffs have carried their heavy burden to show that the President exceeded his authority in issuing Executive Order 13795 where Section 1341(a) confers broad discretion over withdrawals to the President in confluence with the President's broad authority to conduct foreign relations and provide for national defense under Article II of the Constitution.

## PERTINENT STATUTES AND REGULATIONS

Under Circuit Rule 28-2.7, all pertinent constitutional provisions, statutes, and regulations are set forth in an addendum attached to this brief.

## STATEMENT OF THE CASE

### A.   OCSLA Mandates Expeditious Exploration And Development Of The Nation's Critical OCS Oil And Gas Resources.

The OCS is the area of submerged lands that lie seaward of a state's jurisdiction and that are subject to the "jurisdiction and control" of the United States.  *See* 43 U.S.C. § 1331(a); *Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, 563 F.3d 466, 472 (D.C. Cir. 2009).  OCSLA mandates and governs the

4

development of offshore oil and gas resources on the OCS. *See* 43 U.S.C. §§ 1331, *et seq.* Congress enacted OCSLA to promote and ensure the "expedited exploration and development of the [OCS] in order to achieve national economic and energy policy goals, assure national security, reduce dependence on foreign sources, and maintain a favorable balance of payments in world trade." *Id.* § 1802(1); *see also id.* § 1332(3) (the OCS "should be made available for expeditious and orderly development, subject to environmental safeguards, in a manner which is consistent with the maintenance of competition and other national needs").

Congress cemented this mandate when it substantially amended OCSLA in 1978 for the stated purpose of "promot[ing] the swift, orderly and efficient exploitation of our almost untapped domestic oil and gas resources in the Outer Continental Shelf."[3] In short, "the Act has an objective—the expeditious development of OCS resources." *California v. Watt*, 668 F.2d 1290, 1316 (D.C. Cir. 1981). "The first stated purpose of the Act, then, is to establish procedures to expedite exploration and development of the OCS." *Id.* Indeed, "[t]he [Act's] remaining purposes primarily concern measures to eliminate or minimize the risks attendant to that exploration and development. Several of the purposes, in fact, candidly recognize that some degree of adverse impact is inevitable." *Id.*

---

[3] H.R. Rep. No. 95-590, at 8 (1977), *reprinted in* 1978 U.S.C.C.A.N 1450, 1460.

**B.    Congress Designed A Four-Stage Government Review Process To Expedite Orderly OCS Exploration And Development.**

To facilitate OCSLA's developmental purpose and "forestall premature litigation regarding adverse environmental effects that . . . will flow, if at all, only from the latter stages of OCS exploration and production," *Sec'y of the Interior v. California*, 464 U.S. 312, 341 (1984), Congress created "four distinct statutory stages to developing an offshore oil [or gas] well: (1) formulation of a five year leasing plan . . .; (2) lease sales; (3) exploration by the lessees; (4) development and production," *id.* at 337; *see also Ctr. for Biological Diversity*, 563 F.3d at 472–73.[4]

**1.    The Five-Year Leasing Program.**

The five-year leasing program is the first step in the process, in which the Department of the Interior prepares "a schedule of proposed lease sales indicating, as precisely as possible, the size, timing, and location of leasing activity which [the Secretary] determines will best meet national energy needs for the five-year period following its approval or reapproval." 43 U.S.C. § 1344(a). "[P]rospective lease purchasers acquire no rights to explore, produce, or develop at this first stage . . . ." *Sec'y of the Interior*, 464 U.S. at 338.

---

[4] Congress delegated principal responsibility over this extensive and complex development program to the Secretary of the Interior ("Secretary"), *see* 43 U.S.C. § 1331(b), much of whose authority is delegated to the Bureau of Ocean Energy Management ("BOEM").

In deciding upon the five-year leasing program, OCSLA directs the Secretary to "consider[] [the] economic, social, and environmental values of the renewable and nonrenewable resources contained in the [OCS], and the potential impact of oil and gas exploration on other resource values of the [OCS] and the marine, coastal, and human environments." 43 U.S.C. § 1344(a)(1). The Secretary must also assure that the Government receives "fair market value" for any leasing, and "select the timing and location of leasing, to the maximum extent practicable, so as to obtain a proper balance between the potential for environmental damage, the potential for the discovery of oil and gas, and the potential for adverse impact on the coastal zone." 43 U.S.C. § 1344(a)(3)–(4).

In short, "[t]he key national decisions as to the size, timing, and location of OCS leasing . . . are made at this first stage." *Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 595 (D.C. Cir. 2015). Indeed, "no lease shall be issued unless it is for an area included in the approved leasing program . . . ." 43 U.S.C. § 1344(d)(3). The five-year leasing program is also the basis of "long-term plans" for oil and gas leasing and development for "[f]ederal, state, and local governments, and the companies that participate in national and international energy markets." *Ctr. for Sustainable Econ.*, 779 F.3d at 595.

7

### 2.     The Lease Sale.

The second stage in the OCS process is the conduct of the lease sales provided for in the previously-adopted five-year program.  43 U.S.C. § 1337(a)(1).  Upon issuance of a lease, the lessee may prepare certain preliminary activities such as "geological, geophysical, and other surveys necessary to develop a comprehensive exploration plan" for assessment and future development of the oil and gas resources on the lease.  *N. Slope Borough v. Andrus*, 642 F.2d 589, 594 (D.C. Cir. 1980) (alteration and quotation marks omitted).

While some preliminary activities, such as seismic surveys, may be conducted off-lease and prior to a lease sale, *see* 30 C.F.R. § 551.2, these preliminary activities are subject to BOEM review and approval, *see* 30 C.F.R. § 551.5 (off-lease), as well as continuing BOEM control through regulations, lease stipulations, and mitigation measures, *see*, *e.g.*, 30 C.F.R. § 550.208(a) (requiring lessees to provide notice of activities); 30 C.F.R. §§ 550.209, 550.202(e) (explaining that notice must show that activity "[d]oes not cause undue or serious harm or damage to the human, marine, or coastal environment"); 30 C.F.R. § 551.6 (prohibiting approved activities from, *inter alia*, "caus[ing] harm or damage to life" or "caus[ing] pollution").

### 3. The Exploration Stage.

The third stage of the OCS process is exploratory drilling, which must be carried out pursuant to an exploration plan submitted by the lessee. 43 U.S.C. § 1340(c). Pursuant to OCSLA, "Interior reviews and determines whether to approve the lessees' . . . exploration plans," *Ctr. for Biological Diversity*, 563 F.3d at 473, before exploratory drilling operations can commence.

### 4. Development And Production.

The fourth and final phase of the OCS process is development and production, which is reached only if the company's exploratory efforts discover commercially recoverable quantities of hydrocarbons. At the development and production stage, Interior, along with affected state and local governments, reviews an additional and more detailed plan from the lessee, *see* 43 U.S.C. § 1351, for (in typical cases) construction of a production platform, installation of processing equipment, and the laying of pipelines, all of which may remain in place for decades. *See* 43 U.S.C. § 1351(c).[5]

---

[5] A lessee operating under an approved exploration or development plan must also obtain a permit prior to drilling a well pursuant to the plan. *See* 30 C.F.R. § 250.410.

## C. Presidential Withdrawals Of OCS Lands From Consideration For Leasing.

The President also plays a role in the complex OCSLA development process. Among other things, "[t]he President of the United States may, from time to time, withdraw from disposition any of the unleased lands of the outer Continental Shelf." 43 U.S.C. § 1341(a). Historically, Presidents have exercised this authority sparingly. In more recent decades, Presidents have invoked this authority with increasing frequency temporarily to withdraw, or to modify prior withdrawals, of unleased OCS lands.

Starting with President George H.W. Bush who on June 26, 1990 "announce[ed] . . . support for a moratorium on oil and gas leasing and development in Sale Area 116, Part II, off the coast of Florida; Sale Area 91, off the coast of northern California; Sale Area 119, off the coast of central California; and the vast majority of Sale Area 95, off the coast of southern California, *until after the year 2000*." 2 Fed. Defs.' Excerpts of Record ("E.R.") 303 (emphasis added).[6]

---

[6] Even after these withdrawals expired, the temporarily withdrawn areas were never included in a five-year leasing program and were therefore never leased. *See* BOEM, *Past Five Year Programs*, https://www.boem.gov/Past-Five-Year-Programs/ (last visited Nov. 19, 2019). Indeed, no leasing has occurred offshore California since the 1980s.

10

On August 4, 1992, in a memorandum to the Secretary of the Interior, President George H.W. Bush confirmed the Secretary's statement "[i]n the documentation of your decision on the 5-year outer Continental Shelf Oil and Gas Program for 1992-1997" "that my statement on June 26, 1990, concerning putting certain areas off limits to leasing *until after the year 2000*, was made under the authority of" Section 1341(a).  2 E.R. 302 (emphasis added).  He then "further withdr[e]w the remaining 87 tracts in the Southern California Planning Area pending the completion of additional studies in response to the report of the National Academy of Sciences pursuant to the guiding principles I announced June 26, 1990, which satisfactorily address concerns relating to these tracts." *Id*.   This action confirmed President Bush's time-limited June 26, 1990 withdrawal, and extended it to include additional California tracts.

Exercising his authority under Section 1341(a), on June 12, 1998 President Clinton withdrew "from disposition by leasing *through June 30, 2012*, those areas of the [OCS] currently under moratoria pursuant to sections 108–111 of Public Law 105–83," and "for a time period without specific expiration those areas of the [OCS] currently designated Marine Sanctuaries under the Marine Protection, Research, and Sanctuaries Act of 1972, 16 U.S.C. 1431–1434, 33 U.S.C. 1401 *et seq*."  2 E.R. 301 (emphasis added).  The referenced statute had set moratoria in place "in the areas of northern, central, and southern California; the North Atlantic;

11

Washington and Oregon; and the eastern Gulf of Mexico south of 26 degrees north latitude and east of 86 degrees west longitude," and also in the North Aleutian Basin, the Eastern Gulf of Mexico (aside from one defined lease sale area), and the Mid-Atlantic and South Atlantic planning areas. Pub. L. No. 105-83, §§ 108–111, 111 Stat. 1543, 1561 (Nov. 14, 1997).

On January 9, 2007, President George W. Bush expressly invoked his delegated authority under Section 1341(a) to "***modify*** the first sentence of [President Clinton's] withdrawal of June 12, 1998 . . . [to] withdraw from disposition by leasing ***through June 30, 2012***, (1) those areas under moratoria pursuant to sections 104 and 106 of Public Law 109–54, and (2) those areas under moratoria pursuant to section 105 of Public Law 109–54, excluding that portion of the Central Gulf of Mexico planning area defined as the '181 South Area' in section 102(2) of . . . Public Law 109–432 . . . ." 2 E.R. 300 (emphases added). The referenced statutory provisions had set moratoria in (1) the areas of northern, central, and southern California; the North Atlantic; Washington and Oregon; and the eastern Gulf of Mexico south of 26 degrees north latitude and east of 86 degrees west longitude; (2) the Eastern Gulf of Mexico (aside from one defined lease sale area), and (3) the Mid-Atlantic and South Atlantic planning areas. *See* Pub. L. No. 109-54, §§ 104–106, 119 Stat. 499, 521 (Aug. 2, 2005). President Bush's action had the practical effect of opening the North Aleutian Basin for

leasing, and that area was in fact covered by proposed leasing in the subsequent five-year leasing program for 2007-2012. *See Outer Continental Shelf Oil and Gas Leasing Program 2007-2012*, at 21, 35 (April 2007), https://www.boem.gov/Oil-and-Gas-Energy-Program/Leasing/Five-Year-Program/MMSProposedFinalProgram2007-2012-pdf.aspx (last visited Nov. 19, 2019).[7]

On July 14, 2008, President George W. Bush again used his authority under Section 1341(a) to "***modify*** the prior memoranda of withdrawals from disposition by leasing of the United States [OCS] issued on August 4, 1992 [by President H.W. Bush], and June 12, 1998 [by President Clinton], as modified on January 9, 2007 [by himself], to . . . withdraw from disposition by leasing, for a time period without specific expiration, [only] those areas of the [OCS] designated as of July 14, 2008, as Marine Sanctuaries under the Marine Protection, Research, and Sanctuaries Act of 1972, 16 U.S.C. 1431–1434, 33 U.S.C. 1401 et seq." 2 E.R. 299 (emphasis added). This action immediately opened all previously withdrawn OCS lands except for existing Marine Sanctuaries. Among other things, an area of the Mid-Atlantic was thereafter included in the updated five-year leasing program

---

[7] In March 2010, the North Aleutian Basin was withdrawn from disposition for leasing through 2017, and the planned lease sale was canceled. *See* BOEM, *North Aleutian Basin Lease Sale 214*, https://www.boem.gov/Oil-and-Gas-Energy-Program/Leasing/Regional-Leasing/Alaska-Region/Alaska-Lease-Sales/Sale-214/Index.aspx (last visited Nov. 19, 2019).

for 2007-2012. *See Revised Program: Outer Continental Shelf Oil and Gas Leasing Program 2007-2012*, at 85 (Dec. 2010), https://www.boem.gov/Oil-and-Gas-Energy-Program/Leasing/Five-Year-Program/RP-pdf.aspx (describing "one special interest sale (in 2011), but with a 50-mile buffer and a no-obstruction zone from the mouth of the Chesapeake Bay off the coastline of Virginia") (last visited Nov. 19, 2019).[8]

On December 20, 2016 and January 27, 2015, President Obama used his authority under Section 1341(a) to "withdraw from disposition by leasing for a time period without specific expiration" the majority of the Chukchi and Beaufort Sea OCS Planning Areas in Northern Alaska, and "the areas of the [OCS] . . . associated with 26 major canyons and canyon complexes offshore the Atlantic coast." 2 E.R. 289, 290, 296. President Obama explained that these withdrawals were, *inter alia*, "[c]onsistent with principles of responsible public stewardship" and consideration of the withdrawn areas' importance "for marine mammals, other wildlife, and wildlife habitat, and to ensure that the unique resources of these areas remain available for future generations." 2 E.R. 290, 296.

---

[8] In May 2010, the planned Mid-Atlantic lease sale was canceled. *See* BOEM, *Virginia Lease Sale 220 Information*, https://www.boem.gov/Oil-and-Gas-Energy-Program/Leasing/Regional-Leasing/Gulf-of-Mexico-Region/Lease-Sales/220/Virginia-Lease-Sale-220-Information.aspx (last visited Nov. 19, 2019).

On April 28, 2017, President Trump issued Executive Order 13795 to "strengthen[] the Nation's security and reduce[] reliance on imported energy." 2 E.R. 285, § 1. Among other things, the Order "modified" President Obama's withdrawal decisions by limiting the withdrawals to "those areas of the Outer Continental Shelf designated as of July 14, 2008, as Marine Sanctuaries . . . ." 2 E.R. 286, § 5. This modification re-opened the Chukchi and Beaufort Sea OCS Planning Areas in Northern Alaska and areas of the Atlantic OCS to consideration for mineral leasing in a future five-year leasing program. Executive Order 13795 then directed the Secretary of the Interior to "consider[] . . . revising" the existing five-year leasing program to include lease sales in these areas. 2 E.R. 285, § 3.

## D.    Plaintiffs' Lawsuit.

On May 3, 2017, Plaintiffs filed suit challenging Executive Order 13795's modification of President Obama's prior withdrawal decisions. Plaintiffs contend that Section 5 of the Executive Order violates the Property Clause of the Constitution and is *ultra vires* because, in Plaintiffs' view, OCSLA Section 1341(a) "authorizes the President to withdraw unleased lands of the [OCS] from disposition" for leasing, but "[i]t does not authorize the President to re-open withdrawn areas to disposition." 2 E.R. 331, ¶ 58. *See also* 2 E.R. 332, § 64. Plaintiffs therefore asked the district court to, *inter alia*, declare Section 5 invalid, enjoin the Federal Defendants from complying with Section 5, and direct the

15

Secretaries of Interior and Commerce to comply with President Obama's 2015 and 2016 withdrawal orders. *See* 2 E.R. 332–33, Relief Requested ¶¶ 1–4.

The Federal Defendants moved to dismiss the Complaint in light of Plaintiffs' lack of Article III standing, the lack of a ripe controversy, an applicable waiver of sovereign immunity, or a private right of action, and the district court's inability to issue declaratory relief against the President. API also filed a motion to dismiss on the ground that OCSLA's staged developmental structure and judicial review provision, 43 U.S.C. § 1349, require Plaintiffs to bring any challenge to Executive Order 13795 in the D.C. Circuit attendant to a challenge to a five-year leasing program, *see* API Supp. E.R. 23–28, and Plaintiffs therefore filed their challenge "at the wrong time . . ., and in the wrong place," API Supp. E.R. 28. The district court denied the motions to dismiss on March 19, 2018. *See* 1 E.R. 33–61.

The parties thereafter filed cross-motions for summary judgment on the merits of Plaintiffs' argument that "Congress has granted the President power to withdraw lands from industrial development, but . . . it has not granted the power to reverse such withdrawals." API Supp. E.R. 12.

On March 29, 2019, the district court denied the Federal Defendants', API's, and the State of Alaska's cross-motions for summary judgment, and granted Plaintiffs' cross-motion for summary judgment. *See* 1 E.R. 1–32; 2 E.R. 64. The district court concluded that Section 1341(a)'s language was ambiguous as to the

President's authority to modify or revoke a prior withdrawal. *See* 1 E.R. 17–18. But the court ultimately concluded that the provision precludes a President from revoking or modifying a prior withdrawal because Section 1341(a) is "entirely protective," 1 E.R. 19 (quoting API Supp. E.R. 17), consistent with other federal statutes designed "to protect public land," 1 E.R. 21 (quoting API Supp. E.R. 15–16; *see also* 1 E.R. 22–23, and lacks a sufficiently long history of past presidential modifications of withdrawals to demonstrate congressional acquiescence in such modifications, 1 E.R. 29–30. The district court accordingly vacated Section 5 of Executive Order 13795. 2 E.R. 64.

## SUMMARY OF ARGUMENT

The President's power to take a given action "must stem either from an act of Congress or from the Constitution itself." *Dames & Moore v. Regan*, 453 U.S. 654, 668 (1981) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952)). Executive Order 13795 revised the orders issued by President Obama withdrawing areas of the Alaska and Atlantic OCS from disposition for oil and gas leasing. *See* 2 E.R. 286, § 5; 2 E.R. 289, 290, 296. Both Section 1341(a) and Article II of the Constitution support this exercise of presidential authority.

**1.** Section 1341(a) broadly delegates to a President the discretion "from time to time" to "withdraw from disposition any of the unleased lands of the" OCS. 43 U.S.C. § 1341(a). Plaintiffs and the district court read Section 1341(a) only to

17

"authorize[] the President to withdraw unleased lands," but "not [to] authorize the President to re-open withdrawn areas to disposition." 2 E.R. 331, ¶ 58. *See also* 1 E.R. 30. This stilted reading cannot square with Section 1341(a)'s discretionary language or the application of well-settled principles of statutory construction.

Instead, on its face, the discretionary formulation of Section 1341(a) carries both the authority to make an OCS withdrawal in the first instance, and the incidental authority to modify a prior decision as occasion and circumstances demand. That reading is bolstered by OCSLA's meaning and Section 1341(a)'s past practical usage. Presidential authority to modify a prior withdrawal further promotes the Congress's principal purpose in the OCSLA to expand and expedite OCS development, and is consistent with presidential practice treating past withdrawals as time-limited or subject to modification.

By contrast, Plaintiffs' and the district court's contrary narrow reading of Section 1341(a) would both negate Congress's entire purpose in enacting OCSLA by permitting one President permanently to withdraw the entire unleased portions of the OCS from future potential leasing and development, and invalidate *post hac* the consistent understanding of Congress and past Presidents over (at least) the past three decades. Such an interpretation cannot stand. *See*, *e.g.*, *Parra v. Astrue*, 481 F.3d 742, 749 (9th Cir. 2007) (rejecting agency interpretation of statute as "unpersuasive because it contradicts the purpose of the statute"); *Midwest Oil*, 236

18

U.S. at 472–73 ("[I]n determining the meaning of a statute or the existence of a power, weight shall be given to" past usage of the power "even when the validity of the practice is the subject of investigation.").

**2.** The broad authority delegated to the President by OCSLA's language, purpose, and history is further buttressed by the extensive executive power over national security and foreign affairs granted to the President by Article II of the Constitution. Management of national resources on the OCS implicates both these core presidential powers and the property powers delegated to the President by Congress in Section 1341(a). The confluence of the President's statutory and constitutional power in Executive Order 13795 is "supported by the strongest of presumptions and the widest latitude of judicial interpretation" of the President's authority. *Youngstown Sheet & Tube*, 343 U.S. at 636–37 (Jackson, J., concurring).

## STANDARD OF REVIEW

This Court "review[s] de novo the district court's decision to grant summary judgment," *Alliance for the Wild Rockies v. Bradford*, 856 F.3d 1238, 1242 (9th Cir. 2017), "applying the same standards that applied in the district court," *Ctr. for Biological Diversity v. Salazar*, 706 F.3d 1085, 1090 (9th Cir. 2013) (quotation omitted). The Court also "review[s] de novo issues of statutory construction." *Moran v. Screening Pros, LLC*, 923 F.3d 1208, 1211 (9th Cir. 2019); *see also*, *e.g.*,

*Campbell v. City of Los Angeles*, 903 F.3d 1090, 1110 (9th Cir. 2018) (explaining that "we proceed de novo" where "the question is one of statutory construction").

## ARGUMENT

## I.    SECTION 1341(a) AUTHORIZES PRESIDENTIAL MODIFICATION OF OCS WITHDRAWAL DECISIONS.

This case concerns the scope of Congress' delegation of authority over OCS lands to the President in Section 1341(a).  That question of statutory construction requires consideration of the statutory language, along with "the 'structure, history, and purpose' of the statute.'"  *Chan Healthcare*, 844 F.3d at 1138 (quoting *Abramski*, 573 U.S. at 179).  All of these sources of meaning belie the Plaintiffs' and district court's stilted interpretation of the authority Section 1341(a) delegates to the President.  Viewed in the appropriate context, that authority fully supports Executive Order 13795's modification of President Obama's prior withdrawal orders.

### A.    Section 1341(a)'s Broad Discretionary Language Authorizes The President Both To Withdraw And Modify A Withdrawal Of OCS Lands From Consideration For Leasing.

OCSLA provides that the President "*may, from time to time*, withdraw from disposition any of the unleased lands of the [OCS]."  43 U.S.C. 1341(a) (emphasis added).  That language delegates broad discretionary authority to the President. *See*, *e.g.*, *Erdelyi v. O'Brien*, 680 F.2d 61, 62–63 (9th Cir. 1982) (holding that state statute providing that law enforcement "may" issue a license to carry a concealed

firearm "gives the issuing authority broad discretion"); *cf. Ayala-Caballero v. Coleman*, 58 F. App'x 669, 672 (9th Cir. 2002) ("The statutory language of [Immigration and Naturalization Act] § 244 ('the Attorney General may, in his discretion, suspend deportation . . .') makes clear that grants of suspension of deportation are wholly within the discretion of the Attorney General, even if the statutory requisites [for a suspension] are met.").

Moreover, Section 1341(a)'s discretionary formulation—authorizing action that "may" be taken "from time to time"— carries with it a power to revise action previously taken under the delegated authority.   For example: (1) 28 U.S.C. § 2071(a) provides that the Supreme Court and the lower federal courts "may from time to time prescribe rules for the conduct of their business," (2) the Constitution provides that Congress "may from time to time ordain and establish" lower federal courts, U.S. Const. art. III § 1, and (3) a number of statutes authorize federal agencies to promulgate regulations "from time to time," *see*, *e.g.*, 21 U.S.C. § 154 (authorizing Secretary of Agriculture "to make and promulgate from time to time such rules and regulations as may be necessary" to control certain harmful substances).   It is beyond cavil that such formulations permit the courts, Congress, and federal agencies to revise or modify rules, lower federal courts, or regulations once initially established.   *See*, *e.g.*, *Quinn v. California Shipbuilding Corp.*, 76 F. Supp. 742, 743 (S.D. Cal. 1947) (explaining that the power to revoke a court's

jurisdiction is inherently included in the power to grant it); *N. Border Pipeline Co. v. Jackson Cty.*, 512 F. Supp. 1261 (D. Minn. 1981) (holding that state legislature's "power to grant [zoning] authority [to a local government] includes the power to withdraw it").

Plaintiffs' contrary reading of such language to limit the delegated authority only to the power initially to create rules, lower federal courts, or regulations would mean that, for example, Congress is ***not*** authorized to eliminate a lower federal court previously established, and that an administrative agency ***cannot*** revise or repeal a regulation once promulgated. But both Congress and administrative agencies have exercised these powers, repeatedly. Indeed, the discretionary power to ordain and establish inferior courts "from time to time" has been interpreted with great flexibility, ranging from "declin[ing] to create any such courts" to "investing them with jurisdiction either limited, concurrent, or exclusive, [or] withholding jurisdiction from them in the exact degrees and character which to Congress may seem proper for the public good." *Lockerty v. Phillips*, 319 U.S. 182, 187 (1943) (quotation omitted). Moreover, Congress has with some regularity abolished inferior courts it had previously established. *See*, *e.g.*, VanDercreek, *From the Judiciary Act of 1789 to the Judicial Improvements Act of*

*1989 - Two Hundred Years of Non-Inferior Inferior Courts*, 14 Okla. City U. L. Rev. 565, 568–79 (1989).[9]

Courts have recognized that a grant of discretionary authority to the President or an executive officer carries with it an incidental power subsequently to modify the original discretionary decision. Indeed, the Supreme Court has recognized "as a rule of constitutional and statutory construction" that the power to reverse a discretionary decision is "incident to the power" to make that discretionary decision in the first instance. *Myers v. United States*, 272 U.S. 52, 119 (1926).

For example, the Supreme Court has held that a President's discretionary power to "appoint . . . officers of the United States," U.S. Const. art. II § 2, confers upon the President the incidental power to remove an officer. *See Myers*, 272 U.S. at 119 (describing as James Madison's and the First Congress's view that "the express recognition of the power of appointment in the second section [of Article II of the Constitution] enforced this view on the well-approved principle of constitutional and statutory construction that the power of removal of executive officers was incident to the power of appointment"). *See also Free Enter. Fund v.*

---

[9] Congressional power over the lower federal courts is the only instance of the formulation in the Constitution that—like Section 1341(a)—pairs the phrase "from time to time" with the discretionary statement that the delegated authority "may" be taken. *See* U.S. Const. art. III § 1.

*Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 509 (2010) ("Under the traditional default rule, removal is incident to the power of appointment."). Indeed, the Supreme Court recognized a President's ***unilateral*** authority to remove an officer even though the original appointment requires congressional approval. U.S. Const. art. II § 2 (conditioning appointments on "the advice and consent of the Senate"). Given that Section 1341(a) reserves no affirmative congressional role in defining withdrawals, OCSLA thus presents an even stronger case for presidential revisory authority.

The district court dismissed presidential authority under the Appointments Clause as involving a "subject matter . . . or other authority" that "was, by nature, subject to change." 1 E.R. 16–17. But the district court does not explain why the President's constitutional charge to execute the laws—necessitating the appointment and removal power over federal officers—is distinguishable from OCSLA's statutory charge to ensure the "expedited exploration and development of the [OCS]," 43 U.S.C. § 1802(1), which supports the President's companion power to modify a prior withdrawal when occasion requires in order to achieve OCSLA's developmental purpose. *See supra* pp. 1, 4–6; *infra* pp. 27–30.

The President's affirmative constitutional power "to make treaties," U.S. Const. art. II § 2, bestows similarly broad powers upon the President. Again, even though the power initially to enter into a treaty requires "the advice and consent of

24

the Senate," *id*., Presidents have consistently exercised their Article II treaty power unilaterally to withdraw from previously entered treaties. *See Goldwater v. Carter*, 444 U.S. 996 (1979) (declining, on jurisdictional grounds, to overturn President Carter's unilateral withdrawal from President Eisenhower's Sino-American Mutual Defense Treaty); *Bush Pulls Out of ABM Treaty*, N.Y. Times (Dec. 13, 2001), https://www.nytimes.com/2001/12/13/international/bush-pulls-out-of-abm-treaty-putin-calls-move-a-mistake.html (describing President George W. Bush's withdrawal from 1972 Antiballistic Missile Treaty with the Soviet Union) (last visited Nov. 19, 2019).[10]

Nor is such authority to reverse and exercise discretionary authority confined to constitutional powers. In *Pennsylvania v. Lynn*, 501 F.2d 848 (D.C. Cir. 1974), Pennsylvania sued the Secretary for Housing and Urban Development seeking reinstatement of certain housing programs established by Congress that were suspended by the Secretary. *See id*. at 855–56. The court rejected Pennsylvania's argument—analogous to Plaintiffs' claims here—that the Secretary lacked authority to issue the suspensions because the Housing Act gave the

---

[10] It is likewise well-settled that a "President is free to revoke, modify, or supersede his own [Executive] orders or those issued by a predecessor." Congressional Research Service, *Executive Orders: Issuance, Modification, and Revocation*, at 7 (April 16, 2014), https://fas.org/sgp/crs/misc/RS20846.pdf (last visited Nov. 19, 2019). Over the past 25 years alone, Presidents have revoked more than 120 Executive Orders. *See* National Archives, All Executive Orders Since 1994, Fed. Reg. (last visited Nov. 19, 2019), https://bit.ly/2KAs8tn.

Secretary broad discretion to implement the housing programs, but not the express authority to suspend operations. *See id*. at 852. Instead, the "Secretary has the discretion, or indeed the obligation, to suspend the programs' operation when he has adequate reason to believe that they are not serving Congress's purpose" in enacting the Housing Act. *Id*. at 855–56.

Executive Order 13795 similarly exercises the broad incidental authority to modify OCS withdrawals conferred by Section. 1341(a). Here, Section 1341(a) broadly delegates to the President discretion to withdraw OCS lands from disposition for leasing "from time to time" or, in other words, as occasion demands. Having determined—consistent with OCSLA's foundational purpose, *see supra* pp. 1, 4–6; *infra* pp. 27–30—that the occasion now requires modification of prior withdrawals to "strengthen[] the Nation's security and reduce[] reliance on imported energy," 2 E.R. 285, § 1, the President's modification of prior withdrawal decisions is properly incident to the broad discretionary authority to institute a withdrawal in the first instance delegated by Section 1341(a).

Had Congress intended to cabin the discretion inherent in the formulation of Section 1341(a) as Plaintiffs claim and the district court concluded, it needed to do so clearly. *See Shurtleff v. United States*, 189 U.S. 311, 316 (1903) ("We think it quite inadmissible to attribute an intention on the part of Congress to make such an

26

extraordinary change in the usual rule . . . without stating such intention in plain an explicit language, instead leaving it to be implied from doubtful inferences.").

### B. OCSLA's Developmental Purpose Supports Reading Section 1341(a) To Authorize The President Both To Withdraw And Modify A Withdrawal Of OCS Lands From Consideration For Leasing.

In addition to Section 1341(a)'s discretionary language, a reviewing court "must look not only to the 'particular statutory language at issue' but also to 'the language and design of the statute as a whole.'" *In re DBSI, Inc.*, 869 F.3d 1004, 1010 (9th Cir. 2017) (quoting *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988)). In short, "[s]tatutory construction is a holistic endeavor, that relies on context to be a preliminary determinant of meaning," *id.* (internal quotations and citation omitted), including "the 'structure, history, and purpose' of the statute,'" *Chan Healthcare*, 844 F.3d at 1138 (quoting *Abramski*, 573 U.S. at 179). *See also*, *e.g.*, *Presidio Historical Ass'n v. Presidio Trust*, 811 F.3d 1154, 1167 (9th Cir. 2016) (favoring reading of statutory term that "ties the statutory requirements together in a manner consistent with the statute's language and purpose"); *Am. Coal Co. v. Fed. Mine Safety & Health Review Comm'n*, 796 F.3d 18, 26 (D.C. Cir. 2015) ("After all, the plainness or ambiguity of statutory language is determined not only by reference to the language itself, but as well by the specific context in which the language is used, and the broader context of the statute as a

whole." (quoting *Yates v. United States*, 135 S. Ct. 1074, 1081–82 (2015) (alterations omitted)).

Section 1341(a)'s discretionary language is bolstered by OCSLA's purpose. Through OCSLA, Congress delegated to the President and Executive Branch extensive authority over the nation's offshore resources in a statutory scheme carefully designed to promote Congress's primary purpose. *See supra* pp. 4–9. Congress made clear that "[t]he principal purpose of [OCSLA] is to authorize the leasing by the Federal Government of . . . the [OCS]." H.R. Rep. No. 83-413, at 2. *See also* 43 U.S.C. § 1802(1) (explaining congressional purpose to ensure the "expedited exploration and development of the [OCS] in order to achieve national economic and energy policy goals, assure national security, reduce dependence on foreign sources, and maintain a favorable balance of payments in world trade"); 43 U.S.C. § 1332(3) (finding that the OCS "should be made available for expeditious and orderly development").[11] The President's constitutional obligation to "take care that the laws be faithfully executed," U.S. Const. art. II § 3, further supports presidential authority to take discretionary action that, in the President's

---

[11] As the Federal Defendants have demonstrated, to the extent that OCSLA's legislative history bears upon the meaning of Section 1341(a), that history further demonstrates that withdrawal is a discretionary, limited exception to OCSLA's foundational purpose to expedite and expand OCS oil and gas development. *See* Fed. Defs.' Br. at 75–77.

estimation, advances OCSLA's foundational purpose to expedite oil and gas development on the OCS.

Plaintiffs and the district court largely ignore OCSLA's stated purpose in reading Section 1341(a), instead replacing it with Plaintiffs' own contrary policy preference. To that end, the district court accepted the Plaintiffs' view that Section 1341(a) was meant to be "entirely protective" of the environment regardless of OCSLA's overriding developmental purpose. *See* 1 E.R. 19–20 (quotation omitted). But neither the Plaintiffs nor the district court are entitled simply to replace Congress' purpose with Plaintiffs' own.

As the Federal Defendants have explained, the district court did not (and could not) identify a source for such a protective purpose in OCSLA or Section 1341(a). *See* Fed. Defs.' Br. at 66–68. To the contrary, in view of Congress' explicit "objective—the expeditious development of OCS resources," *Watt*, 668 F.2d at 1316—reading Section 1341(a) to allow a President to reverse or modify a prior withdrawal in order to open areas to potential future disposition for leasing conforms to "[t]he first stated purpose of the Act . . . to establish procedures to expedite exploration and development of the OCS." *Id.* (explaining that OCSLA's remaining purposes "candidly recognize that some degree of adverse [environmental] impact is inevitable").

29

By contrast, Plaintiffs' assertion that Section 1341(a) precludes any reversal or modification of an existing withdrawal from leasing would give a President the authority single-handedly—until Congress could enact a repealing statute subject to the President's veto—to negate OCSLA's developmental purpose by withdrawing the entire unleased OCS from disposition for leasing.

"[S]uch an interpretation is unpersuasive because it contradicts the purpose of the statute." *Parra*, 481 F.3d at 749 (rejecting agency interpretation of statute). *See also*, *e.g.*, *Donovan v. S. Cal. Gas Co.*, 715 F.2d 1405, 1408 (9th Cir. 1983) ("To allow the construction of the statute which the [party] here urges undermines the purpose of Congress in enacting the statute. We will not do so."). Construction of Section 1341(a) depends on "the statute's language and purpose," *Presidio Historical Ass'n*, 811 F.3d at 1167, not what Plaintiffs would prefer Congress had said or intended.

### C. Presidential And Congressional Practice Supports Reading Section 1341(a) To Authorize The President Both To Withdraw And Modify A Withdrawal.

It is also not enough, as Plaintiffs contend, that the statutory language "does not in so many words confer" upon the President a power to revise or modify a withdrawal, *Haig v. Agee*, 453 U.S. 280, 290 (1981); *see also* 1 E.R. 11 (Section 1341(a) "does not expressly authorize the President to revoke a prior withdrawal"),

because the "history . . . of the statute" informs its ultimate meaning, *see Chan Healthcare*, 844 F.3d at 1138 (quotation omitted).

In particular, a reviewing court must give heed to a "consistent" usage of authority delegated to the Executive Branch. *Haig*, 453 U.S. at 291. *See also New Process Steel, L.P. v. NLRB*, 560 U.S. 674, 686 (2010) ("[O]ur reading of the court of appeals quorum provision was informed by the longstanding practice of allowing two judges from the initial panel to proceed to judgment in the case of a vacancy . . . ."); *Haig*, 453 U.S. at 300 (noting "that congressional acquiescence may sometimes be found from nothing more than silence in the face of an administrative policy"); *United States v. Amirnazmi*, 645 F.3d 564, 579 (3rd Cir. 2011). Indeed, "a history of administrative construction and congressional acquiescence may add a gloss or qualification to what is on its face unqualified statutory language." *Saxbe v. Bustos*, 419 U.S. 65, 74 (1974) (citing *United States v. Midwest Oil Co.*, 236 U.S. 459 (1915)).

The Supreme Court's foundational decision in *United States v. Midwest Oil Co.*, 236 U.S. 459 (1915), is instructive. At the dawn of oil development in the United States, Congress made public lands "containing petroleum or other mineral oils . . . 'free and open to occupation, exploration, and purchase by citizens of the United States . . . .'" *Id*. at 466 (quoting Act of February 11, 1897). To stem an ever-accelerating transfer of public lands to private ownership under this law,

however, the President temporarily withdrew from disposition all unleased public lands in California and Wyoming. *See id.* at 467. The Supreme Court rejected the challenging oil company's argument that "there is no dispensing power in the Executive and that he could not suspend a statute or withdraw from entry or location any land which Congress had affirmatively declared should be free and open to acquisition by citizens." *Id.* at 468.

Instead, the Court noted the "long-continued practice" of numerous Presidents "to make [withdrawal] orders like the one here involved," *id.* at 469, "when it appeared that the public interest would be served," *id.* at 471. As with presidential exercise of the OCSLA withdrawal power, *see supra* pp. 10–15, "Congress did not repudiate the power claimed or the [property] orders made. On the contrary, it uniformly and repeatedly acquiesced in the practice . . . ." *Midwest Oil*, 236 U.S. at 471. As the Court explained,

> government is a practical affair, intended for practical men. Both officers, lawmakers, and citizens naturally adjust themselves to any long-continued action of the Executive Department, on the presumption that unauthorized acts would not have been allowed to be so often repeated as to crystallize into a regular practice. That presumption is not reasoning in a circle, but the basis of a wise and quieting rule that, in determining the meaning of a statute or the existence of a power, weight shall be given to the usage itself, even when the validity of the practice is the subject of investigation.

32

*Id*. at 472–73.  *See also Udall v. Tallman*, 380 U.S. 1, 17 (1965) (relying on *Midwest Oil* and past practice in construing executive order's effect on oil and gas leases).

In short, the continuing practice "would raise [the] presumption that the [Presidents' decisions] had been made in pursuance of [congressional] consent or of a recognized administrative power of the Executive in the management of public lands."  *Midwest Oil*, 236 U.S. at 474.  *See also NLRB v. Noel Canning*, 573 U.S. 513, 525 (2014) ("[T]he longstanding 'practice of government' can inform our determination of what the law is." (quoting *McCulloch v. Maryland*, 17 U.S. 316, 4 Wheat. 316, 401 (1819) and *Marbury v. Madison*, 5 U.S. 137, 1 Cranch 137, 177 (1803))); *EEOC v. Peabody W. Coal Co.*, 773 F.3d 977, 989 (9th Cir. 2014) (citing *Midwest Oil*, 236 U.S. at 474).  Accordingly, and contrary to the district court's dismissal of withdrawal history under OCSLA, *see* 1 E.R. 29 (finding "the small number of prior revocations" insufficient), the Supreme Court "has treated practice as an important interpretive factor ***even when the nature or longevity of that practice is subject to dispute*** . . . ."  *Noel Canning*, 573 U.S. at 525 (emphasis added).

For this case, the importance of past practice between Congress and the President "is particularly true in view of the fact that . . . the land laws are not of a legislative character in the highest sense" because the Property Clause is not

included amongst the enumerated "legislative power[s]" of the United States in Article I of the Constitution, *Midwest Oil*, 236 U.S. at 474; *see also* U.S. Const. art. I § 1, but rather appears in Article IV and therefore "savor[s] somewhat of mere rules prescribed by an owner of property for its disposal," *Midwest Oil*, 236 U.S. at 474; *see also* U.S. Const. art. IV § 3. Where emergencies arise or conditions change, "there is nothing in the nature of the power exercised which prevents Congress from granting it by implication just as could be done by any other owner of property under similar conditions." *Midwest Oil*, 236 U.S. at 474. In other words, "[t]he power of the Executive, as agent in charge, . . . need not necessarily be expressed in writing," *id*., but can be defined in practice.

Here, the practice under Section 1341(a) over at least the past three decades illustrates that withdrawals have rarely, if ever, been treated as permanent or inviolate. Presidents George H.W. Bush, Clinton, and George W. Bush all expressly limited withdrawals of OCS lands until a specified date. *See supra* pp. 10–14. Moreover, President George W. Bush twice invoked his Section 1341(a) authority to modify prior presidential withdrawal decisions and re-open OCS lands for potential disposition for mineral leasing. *See supra* pp. 12–14.

Indeed, after President George W. Bush used his authority under Section 1341(a) to "modify the prior memoranda of withdrawals from disposition by leasing" to open all previously withdrawn OCS lands except for existing Marine

34

Sanctuaries, *see* 2 E.R. 299, Congress followed suit by excluding its prior leasing moratoria from appropriations for 2009, *see* Consolidated Security, Disaster Assistance, and Continuing Appropriation Act, 2009, Pub. L. No. 110-329, 122 Stat. 3574 (Sept. 30, 2008). Congress has therefore both acquiesced in, and directly accepted, prior presidential withdrawal decisions and modifications.

President Obama followed this practice by issuing withdrawals "for a time period without specific expiration." 2 E.R. 289, 290, 296. But the lack of a "specific" expiration confirms that the withdrawal is subject to expiration. Indeed, in his December 20, 2016 statement announcing and justifying the withdrawal— which Plaintiffs contend to be permanent—of unleased Arctic areas from disposition for leasing, President Obama indicated the changeable circumstances that may inform a withdrawal decision, noting, *inter alia*, that "at **current** oil prices" the Department of Interior concluded that "significant production in the Arctic will not occur."[12] Such reliance on "current" conditions suggests a different outcome under future, changed conditions.

Because Section 1341(a) does not "expressly" permit a President to issue a time-limited or otherwise changeable withdrawal, 1 E.R. 11, Plaintiffs'

---

[12] *See Statement by the President on Actions in the Arctic and Atlantic Oceans*, at 1 (Dec. 20, 2016) (emphasis added), https://obamawhitehouse.archives.gov/the-press-office/2016/12/20/statement-president-actions-arctic-and-atlantic-oceans (last visited Nov. 19, 2019).

35

interpretation of Section 1341(a) and the district court's resulting decision would invalidate *post hoc* these past presidential withdrawals. Indeed, during oral argument on the parties' cross-motions for summary judgment, Plaintiffs' counsel suggested that the temporary, time-limited withdrawals common on the OCS would in fact violate Section 1341(a) in the absence of express language granting such authority. *See* API Supp. E.R. 9–10 (arguing that in "statutes like the Pickett Act, Congress is explicit when it gives temporary power," but "[h]ere Congress didn't say one way or another permanent or temporary"). Decades of executive and congressional practice thus belie Plaintiffs' position and the district court's decision.

Viewed as a whole, Section 1341(a)'s history of practice confirms that withdrawals are not a one-way, permanent street, but have often been either issued on a temporary or time-limited basis, or subsequently revised prior to the date set for expiration. In each instance, Congress could have issued its own moratoria, or otherwise over-ridden the President's withdrawals pursuant to the Property Clause, if it disagreed with the President's exercise of authority under Section 1341(a). It did not do so. Past practice is therefore inconsistent with the notion that withdrawals are permanent and inviolate, and directly undermines Plaintiffs' and the district court's views that Executive Order 13795 exceeds the President's authority under Section 1341(a).

36

\*     \*     \*

Taken together, the plain terms, "structure, history, and purpose" of OCSLA, *Chan Healthcare*, 844 F.3d at 1138 (quotation omitted), confirm Section 1341(a)'s broad delegation to the President of discretionary authority both to withdraw OCS lands from disposition for leasing, and modify withdrawals when the occasion so requires. The district court's opposite reading of Section 1341(a) to preclude any reversal or modification of a withdrawal decision is contrary to both the established tools of statutory construction and sound reasoning. "[I]t would make little sense for Congress," *S. Utah Wilderness All. v. BLM*, 425 F.3d 735, 786 (10th Cir. 2005), to establish the complicated OCSLA structure for the express purpose of expanding and expediting oil and gas development, *see supra* pp. 4–9, and then give a single President authority single-handedly to negate the statutory purpose by permanently removing all unleased lands from such development beyond the reach of future Presidents or the Congress.

## II. THE PRESIDENT'S DELEGATED DISCRETIONARY AUTHORITY UNDER SECTION 1341(a) COMBINED WITH THE PRESIDENT'S ARTICLE II POWERS FURTHER SUPPORT EXECUTIVE ORDER 13795.

In his well-known concurring opinion in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), "Justice Jackson set forth a tripartite framework for evaluating the President's powers to act depending on the level of congressional

37

acquiescence," *Zivotofsky ex rel. Zivotofsky v. Sec'y of State*, 725 F.3d 197, 204

(D.C. Cir. 2013). Under that framework,

> When the President acts pursuant to an ***express or implied authorization from Congress, he exercises not only his powers but also those delegated by Congress. In such a case the executive action*** "***would be supported by the strongest of presumptions and the widest latitude of judicial interpretation, and the burden of persuasion would rest heavily upon any who might attack it.***" When the President acts in the absence of congressional authorization he may enter "a zone of twilight in which he and Congress may have concurrent authority, or in which its distribution is uncertain." In such a case the analysis becomes more complicated, and the validity of the President's action, at least so far as separation-of-powers principles are concerned, hinges on ***a consideration of all the circumstances which might shed light on the views of the Legislative Branch toward such action, including "congressional inertia, indifference or quiescence."*** Finally, when the President acts in contravention of the will of Congress, "his power is at its lowest ebb," and the Court can sustain his actions "only by disabling the Congress from acting upon the subject."

*Dames & Moore*, 453 U.S. at 668–69 (quoting *Youngstown Sheet & Tube*, 343

U.S. at 635–38 (Jackson, J., concurring)) (emphases added). In other words, the

President's power is at its apex where Congress's express or implied delegation of

authority over a given action converges with the President's own constitutional

authority covering the action. Executive Order 13795 rests on such an apex.

OCSLA's language and purpose either exhibit implied authorization for

Executive Order 13795, *see supra* pp. 20–30, or past practice coupled with

congressional "quiescence" support the Presidents' adoption of non-permanent

withdrawals and modifications as circumstances dictate. *See supra* pp. 30–37. *See*

*also Dames & Moore*, 453 U.S. at 668–69 ("[I]t is doubtless the case that executive action in any particular instance falls, not neatly in one of three pigeonholes, but rather at some point along a spectrum running from explicit congressional authorization to explicit congressional prohibition."). Alongside this congressional authorization, as Federal Defendants explained, the management and disposition of the resources on the OCS also implicate the President's authority to provide for national security and conduct foreign affairs. *See* Fed. Defs.' Br. at 4, 67–68.

Because the President's statutory and constitutional power thus converge, Executive Order 13795 is "supported by the strongest of presumptions and the widest latitude of judicial interpretation" of the President's authority. *Youngstown Sheet & Tube*, 343 U.S. at 636–37 (Jackson, J., concurring).[13] Plaintiffs have not met their "heav[y]" burden to prove otherwise. *Id*. at 637 (Jackson, J., concurring).

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's decision granting summary judgment to the Plaintiffs, and direct entry of summary judgment for Federal Defendants and the Intervenor-Defendants.

Respectfully submitted,

*/s/ Steven J. Rosenbaum*
Steven J. Rosenbaum

---

[13] The district court did not address, let alone apply, this presumption triggered by the presence of the both the constitutional and statutory powers of the President.

Bradley K. Ervin
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, N.W.
Washington, D.C. 20001
Phone: (202) 662-6000
Fax: (202) 662-6291
srosenbaum@cov.com

*Attorneys for Defendant-Intervenor-Appellant American Petroleum Institute*

## CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) and the Court's September 3, 2019 Scheduling Order (Dkt. No. 10) because this brief contains 8,946 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word using 14-point Times New Roman font.

*/s/  Steven J. Rosenbaum*
Steven J. Rosenbaum
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, N.W.
Washington, D.C. 20001
Phone: (202) 662-6000
Fax: (202) 662-6291
srosenbaum@cov.com

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, the American Petroleum Institute states that this case is related only to the appeals already consolidated with this appeal. The consolidated appeals are docketed as No. 19-35460 and No. 19-35462.

The American Petroleum Institute is aware of no other related cases pending in this Court.

*/s/ Steven J. Rosenbaum*
Steven J. Rosenbaum
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, N.W.
Washington, D.C. 20001
Phone: (202) 662-6000
Fax: (202) 662-6291
srosenbaum@cov.com

# ADDENDUM

<u>United States Constitution</u>

U.S. Const. art. I § 1 ................................................................. 1a

U.S. Const. art. II § 2 ................................................................ 2a

U.S. Const. art. II § 3 ................................................................ 3a

U.S. Const. art. III § 1 ............................................................... 4a

U.S. Const. art. IV § 3 ............................................................... 5a

<u>Outer Continental Shelf Lands Act</u>

43 U.S.C. § 1341(a) .................................................................. 6a

**United States Constitution**
**Article I, Section 1**

All legislative powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives.

## United States Constitution
## Article II, Section 2

The President shall be commander in chief of the Army and Navy of the United States, and of the militia of the several states, when called into the actual service of the United States; he may require the opinion, in writing, of the principal officer in each of the executive departments, upon any subject relating to the duties of their respective offices, and he shall have power to grant reprieves and pardons for offenses against the United States, except in cases of impeachment.

He shall have power, by and with the advice and consent of the Senate, to make treaties, provided two thirds of the Senators present concur; and he shall nominate, and by and with the advice and consent of the Senate, shall appoint ambassadors, other public ministers and consuls, judges of the Supreme Court, and all other officers of the United States, whose appointments are not herein otherwise provided for, and which shall be established by law: but the Congress may by law vest the appointment of such inferior officers, as they think proper, in the President alone, in the courts of law, or in the heads of departments.

The President shall have power to fill up all vacancies that may happen during the recess of the Senate, by granting commissions which shall expire at the end of their next session.

## United States Constitution
## Article II, Section 3

He shall from time to time give to the Congress information of the state of the union, and recommend to their consideration such measures as he shall judge necessary and expedient; he may, on extraordinary occasions, convene both Houses, or either of them, and in case of disagreement between them, with respect to the time of adjournment, he may adjourn them to such time as he shall think proper; he shall receive ambassadors and other public ministers; he shall take care that the laws be faithfully executed, and shall commission all the officers of the United States.

**United States Constitution**
**Article III, Section 1**

The judicial power of the United States, shall be vested in one Supreme Court, and in such inferior courts as the Congress may from time to time ordain and establish. The judges, both of the supreme and inferior courts, shall hold their offices during good behaviour, and shall, at stated times, receive for their services, a compensation, which shall not be diminished during their continuance in office.

## United States Constitution
## Article IV, Section 3

New states may be admitted by the Congress into this union; but no new states shall be formed or erected within the jurisdiction of any other state; nor any state be formed by the junction of two or more states, or parts of states, without the consent of the legislatures of the states concerned as well as of the Congress.

The Congress shall have power to dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States; and nothing in this Constitution shall be so construed as to prejudice any claims of the United States, or of any particular state.

# Outer Continental Shelf Lands Act
## 43 U.S.C. § 1341

(a) Withdrawal of unleased lands by President

The President of the United States may, from time to time, withdraw from disposition any of the unleased lands of the outer Continental Shelf.

(b) First refusal of mineral purchases

In time of war, or when the President shall so prescribe, the United States shall have the right of first refusal to purchase at the market price all or any portion of any mineral produced from the outer Continental Shelf.

(c) National security clause

All leases issued under this subchapter, and leases, the maintenance and operation of which are authorized under this subchapter, shall contain or be construed to contain a provision whereby authority is vested in the Secretary, upon a recommendation of the Secretary of Defense, during a state of war or national emergency declared by the Congress or the President of the United States after August 7, 1953, to suspend operations under any lease; and all such leases shall contain or be construed to contain provisions for the payment of just compensation to the lessee whose operations are thus suspended.

(d) National defense areas; suspension of operations; extension of leases

The United States reserves and retains the right to designate by and through the Secretary of Defense, with the approval of the President, as areas restricted from exploration and operation that part of the outer Continental Shelf needed for national defense; and so long as such designation remains in effect no exploration or operations may be conducted on any part of the surface of such area except with the concurrence of the Secretary of Defense; and if operations or production under any lease theretofore issued on lands within any such restricted area shall be suspended, any payment of rentals, minimum royalty, and royalty prescribed by such lease likewise shall be suspended during such period of suspension of operation and production, and the term of such lease shall be extended by adding thereto any such suspension period, and the United States shall be liable to the lessee for such compensation as is required to be paid under the Constitution of the United States.

(e) Source materials essential to production of fissionable materials

All uranium, thorium, and all other materials determined pursuant to paragraph (1) of subsection (b) of section 5 of the Atomic Energy Act of 1946, as amended, to be peculiarly essential to the production of fissionable material, contained, in whatever concentration, in deposits in the subsoil or seabed of the outer Continental Shelf are reserved for the use of the United States.

(f) Helium ownership; rules and regulations governing extraction

The United States reserves and retains the ownership of and the right to extract all helium, under such rules and regulations as shall be prescribed by the Secretary, contained in gas produced from any portion of the outer Continental Shelf which may be subject to any lease maintained or granted pursuant to this subchapter, but the helium shall be extracted from such gas so as to cause no substantial delay in the delivery of gas produced to the purchaser of such gas.

# CERTIFICATE OF SERVICE

I hereby certify that on this 22nd day of November, 2019, a true and correct copy of the foregoing was filed via the Court's CM/ECF system, and served via the Court's CM/ECF system upon the following:

Nathaniel S.W. Lawrence
Natural Resources Defense Council
3723 Holiday Drive, SE
Olympia, WA 98501
(360) 534-9900
nlawrence@nrdc.org

Erik Grafe
EarthJustice
441 W. 5th Avenue, Suite 301
Anchorage, AK 99501
(907) 792-7102
egrafe@earthjustice.org

*Counsel for Plaintiffs-Appellees*

Justin D. Heminger
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7415, Ben Franklin Station
Washington, D.C. 20044
(202) 514-5442
justin.heminger@usdoj.gov

*Counsel for Federal Defendants-Appellants*

Kathryn R. Vogel
Senior Assistant Attorney General
Opinions, Appeals, and Ethics Section
Alaska Department of Law
1031 W. 4th Ave, Suite 200
Anchorage, AK 99501
(907) 269-5233
kathryn.vogel@alaska.gov

*Counsel for Defendant-Intervenor-Appellant State of Alaska*

*/s/ Steven J. Rosenbaum*
Steven J. Rosenbaum
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, N.W.

1

Washington, D.C. 20001
Phone: (202) 662-6000
Fax: (202) 662-6291
srosenbaum@cov.com